NEVA, INC., a Florida corporation by change of name to Alexander Scourby Bible Recordings, Inc., and the Estate of Alexander Scourby, Plaintiffs,

v.

CHRISTIAN DUPLICATIONS INTERNATIONAL, INC., a Florida corporation, Christian Duplications, Inc., a Florida corporation, R.B. Turney, Episcopal Radio T–V Foundation, Inc., a Georgia corporation, and International Cassette Corp., a Texas corporation, Defendants.

No. 86–547–CIV–ORL–19.

United States District Court,
M.D. Florida,
Orlando Division.

April 11, 1990.

Stefan v. Stein, C. Steven Yerrid, and Christopher S. Knopik, Stagg, Hardy & Yerrid, P.A., Tampa, Fla., for plaintiffs.

Herbert L. Allen, Duckworth, Allen & Dyer, Bruce B. Blackwell, King & Blackwell, P.A., and Lynn James Hinson, Dean, Mead, Egerton, Bloodworth Capouano & Bozarth, P.A., Orlando, Fla., for defendants.

## ORDER

FAWSETT, District Judge.

This case involves claims surrounding the narrations by the late Mr. Alexander Scourby of the King James Version of the Old Testament and the King James Version of the New Testament in 1972 and 1974 respectively at the request of the director of the Defendant Episcopal Radio T–V Foundation, Inc. ("Episcopal Foundation"), Ms. Carolina Rakeshaw. The agreement between Mr. Scourby and the Episcopal Foundation was not reduced to a single formal document but was established by oral and written evidence when various of the parties' claims were presented to a jury in trial proceedings commencing on August 22, 1989. During the jury trial, the following facts were established.

## STATEMENT OF THE FACTS

Alexander Scourby, a well known actor whose voice became known as the "Voice of the Bible" and whose artistic contributions included the narration of "Victory at Sea", began reading for the blind and physically handicapped as a young actor in the 1930's. According to his agent, Fifi Oscard, Scourby did thousands of readings for the blind and particularly loved to read the Bible. Members of Scourby's family also had ties with the Episcopal Church, so when Caroline Rakestraw, Director of the Episcopal Radio TV Foundation, Inc., called Ms. Oscard on June 12, 1972 to ask if Mr. Scourby would do a narration of the Old Testament to be distributed by the Episcopal Foundation in accordance with its nonprofit purposes, primarily to the blind and physically handicapped, Oscard knew that Scourby would love the undertaking. The testimony established that the Episcopal Foundation was part of the Episcopal Church, the mission of which is to spread the Gospel throughout the world through mass media. While the Episcopal Foundation is financially independent of the Episcopal Church, it is related to the Church and the Church's mission.

Scourby agreed to do the narration for a reduced fee.[1] A union waiver was obtained.[2] According to Ms. Oscard, who ne-

---

1. His fee for the narration of the New Testament was also reduced.

2. Robert Spiro of the American Federation of TV and Radio artists (AFTRA) granted the waiver for Scourby, a union member, to do the

gotiated on behalf of Mr. Scourby with Ms. Rakestraw of the Episcopal Foundation, the parties intended that the use of Scourby's narration would be for the non-profit purposes of the Episcopal Foundation, and if the Episcopal Foundation made a profit from the sale of the Bible recording by Scourby, the Episcopal Foundation would use the profit to further their other non-profit work, to make more Bible recordings, and to make gifts of such Bible recordings, especially to the blind and physically handicapped. There was no intent to convey to the Episcopal Foundation the right to commercially sell the narration for profit.

In 1974, Ms. Rakestraw contacted Ms. Oscard to request that the narration of the New Testament be done by Scourby under the same terms and conditions as he had made the narration of the Old Testament.[3]

With reference to the narration of the Old Testament made in 1972 and the subsequent narration of the New Testament made by Scourby in 1974, the Episcopal Foundation paid the costs of production, the cost of publicity, and the fee to Scourby. The Episcopal Foundation, however, did not supervise the creation of this work by Scourby, a well known and accomplished artist. While Caroline Rakestraw physically attended the recordings of both narrations, there was no evidence that she was

knowledgeable or experienced in the artistic elements of their creation or exercised any control over Scourby's works.

In 1974, Scourby completed his narration of the New Testament, and for a time the Episcopal Foundation marketed both narrations in accordance with the understanding reached by the parties. Press releases were distributed; a pamphlet with the picture of Alexander Scourby was prepared by the Episcopal Foundation; advertisements were placed in newspapers; an event was scheduled at Rich's department store in Atlanta with Mr. Scourby; Scourby attended a banquet in 1974 at which the Episcopal Foundation received an award for its work with the narrations; and in 1974, Scourby was featured on the Today show where he did a widely televised reading of portions of the Bible at Thanksgiving.

In 1977, Mr. R.B. Turney contacted Mr. Hunt, an agent of Ms. Oscard, to get information concerning the rights to the narrations which he wished to commercialize through his company (Plaintiffs' Ex. 63). Mr. Hunt, by letter, advised Turney that he would have to get permission from the Episcopal Foundation to use the tapes and that he would have to pay a fee to Mr. Scourby in order to commercialize the narrations (Plaintiffs' Ex. 59).[4] Rakestraw testified that the sale of the cassette tapes

narration for the Episcopal Foundation without requiring payment of union fees by Scourby pursuant to representations made by Caroline Rakestraw in her letter of June 20, 1972 to Spiro (Plaintiffs' Ex. 7). Spiro testified the waiver was given by the union because the narration would not be used or sold commercially and because it was deemed to be a significant contribution by Scourby. The evidence reflected other letters between Rakestraw and Spiro confirming this understanding (Plaintiffs' Exs. 8, 9, and 10).

3. Rakestraw's letter to Oscard dated January 3, 1974 (Plaintiffs' Ex. 11) references "worldwide audio rights" to the narration in the Episcopal Foundation. Ms. Oscard testified that this was no change from the prior contract because Scourby had not placed a geographic limitation on the distribution of the narration of the Old Testament. While Oscard felt the master tapes to the narrations would be owned by the Episcopal Foundation, she felt the commercial rights for these narrations would remain in Scourby. There is no evidence that either Rakestraw or

Oscard discussed who owned the commercial rights during these negotiations.

4. In 1974, Xerox Corporation had contacted Oscard to develop a promotion for its employees and customers whereby it would distribute the Scourby narrations of the Bible for a low fee. From 1974 to 1976, Oscard and the Episcopal Foundation negotiated this deal with Xerox on the basis that Scourby and the Episcopal Foundation would split any income derived from Xerox's commercialization of the narrations. (*See* Plaintiffs' Exs. 12, 13, 14, and 15). This deal was not consummated by Xerox. During the course of these negotiations, there is no evidence that the Episcopal Foundation took the position that it owned all the rights to the narrations and that Scourby had no rights. For example, in one letter written by Caroline Rakestraw to Mr. Hunt she emphasized that the Foundation "want[ed] to continue being a source for our Spoken Bible within the community we presently serve, which is primarily the Episcopal Church. (Plaintiffs' Ex. 15).

of Scourby's narrations was one of her pet projects and that she wanted to continue on behalf of the Episcopal Foundation with their distribution. Therefore, no agreement with Turney or his company was made.

After Ms. Rakestraw retired in 1980, however, the Episcopal Foundation granted Turney's company, Christian Duplications International, Inc. (CDI), a license, for a fee, on January 5, 1982 (Plaintiffs' Exhibit 28). There was no limitation on the use of such narrations by Turney or his company.[5] CDI began commercially selling the Scourby narrations for profit by January 22, 1982, affixing to such cassettes the words "Authorized Alexander Scourby's Latest Narration".[6]

Alexander Scourby died on February 22, 1985. Prior to his death, he signed an exclusive recording agreement with Plaintiff, Neva, Inc. and with Counterdefendant, MASC, Inc. (Plaintiffs' Ex. 49). MASC, Inc. was a corporation formed by Mr. Scourby and his wife, Lori March Scourby. After Scourby's death, Mr. Spiro, at the request of a representative of Oscard's agency, wrote to the new director of the Episcopal Foundation, Reverend Lewis Schueddig, concerning the original contract between the Episcopal Foundation and Spiro. (Plaintiffs' Ex. 17). In this letter, Mr. Spiro stated that an AFTRA waiver was previously granted based on the condition that Episcopal Foundation did not anticipate a profit from the sale of the narrations. Further, Mr. Spiro reiterated that Mr. Scourby made the narrations "at a fee well below his normal narration fee." (*Id.*). In 1985, Fifi Oscard learned that the Episcopal Foundation had transferred its rights in the Scourby narration to CDI for the purpose of selling the tapes for profit with a royalty to be paid to the Episcopal Foundation by CDI. This lawsuit followed.

While there was evidence that Oscard and possibly Scourby had been shown the Episcopal Foundation's copyright on the cassette tapes of the narrations, it appears from the evidence that neither Oscard nor Scourby were familiar with copyright law or had any reason to suspect that the copyright notice would change the agreement between the parties. There is no evidence that Alexander Scourby was aware during his lifetime that the Episcopal Foundation had transferred its rights to the narration to a for-profit corporation.

During the course of the trial, William M. Milom testified, without objection, as an expert in the areas of entertainment and copyright law. Mr. Milom testified that an artist may segregate in time and territory the rights to a creative work and grant different rights to such creative work. The common practice among artists and entertainers is to negotiate informally, without a written contract, the use of an artist's work by a non-profit entity, because of the high degree of trust that is involved. He also testified that it is customary when an artist grants non-profit rights to an artistic work to a non-profit entity, such artist will retain all of the rights to the work, and the non-profit entity receiving the rights should not engage in commercialization of the creation. A copyright received by one party should not change the contract between the artist and the non-profit entity.

On September 11, 1989, the Jury rendered its Verdict (Doc. No. 266, filed September 11, 1989) as follows.[7] On the claim

---

**5.** In 1974 the Episcopal Foundation and CDI renegotiated the royalty which CDI was to pay. The parties entered into various other agreements for the use of the Scourby narrations (Plaintiffs' Exs. 33 and 34; Defendants' Exs. 42 and 43).

**6.** Christian Duplications, Inc. is the parent corporation formed by Turney in 1973. Christian Duplications International, Inc. was formed in 1975. Both were for-profit corporations. In 1984, the corporations signed Articles and Plan of Merger. (Plaintiffs' Exs. 25(a) and 25(b)). In 1987, CDI transferred its interest in the Scourby narrations to International Cassette Corporation. (*See* Plaintiffs' Exs. 39A, 82, 86

(federal), 40A–J (state) applications for trademark registration; Plaintiffs' Exs. 87, 87a, 88, 89, and 90, copyright registration).

**7.** During the course of the trial Plaintiffs stipulated to the entry of a Directed Verdict on their claim in Count V for imposition of a constructive trust against Defendant CDI and Episcopal Foundation. The Court severed Count VII of Plaintiffs' Complaint, alleging copyright infringement, for trial at a later date. The Court also entered a Directed Verdict against CDI on its counterclaims based on the Sherman Antitrust Act (Counts V and VI of the Counterclaim) and based on the Clayton Antitrust Act (Count VII of the Counterclaim).

of Plaintiffs, Neva, Inc.[8] and the Estate of Alexander Scourby for federal unfair competition (Count I), the jury found in favor of Plaintiffs and assessed damages of $1,070,581.00 against Christian Duplications International, Inc. ("CDI") and Christian Duplications, Inc. ("CD"), and assessed damages against International Cassette Corporation ("ICC") in the amount of $227,-256.00.[9] The Jury found in favor of Plaintiffs Neva and the Estate of Scourby on their claim of unauthorized publication of name under Florida Statute 540.08 (1989) (Count III), awarding in favor of the Plaintiffs and against CDI and CD compensatory damages of $74,558.00 and punitive damages of $50,000.00, awarding against Defendant Turney compensatory damages of $100.00 and punitive damages of $175,-000.00, awarding against Defendant ICC compensatory damages of $45,451.00 and punitive damages of $50,000.00, and awarding against Defendant Episcopal Radio TV Foundation, Inc. compensatory damages of $100.00 and punitive damages of $1.00. On Plaintiff's claim for breach of contract against Episcopal Foundation (Count VI), the Jury found in favor of Plaintiffs and awarded $172,000.00 as compensatory damages against such Defendant. By Supplemental Verdict (Doc. No. 267, filed September 11, 1989) the Jury found against Defendants on their affirmative defenses of laches, estoppel, waiver and the statute of limitations as to these claims of Plaintiffs.

The Jury rendered a Verdict against Counterclaimant CDI on the following counterclaims: common-law fraud (Count I), civil theft (Count II), libel and slander of title (Count III), civil conspiracy (Count IV), and violations of the federal RICO act, 18 U.S.C. § 1962 (Count VIII)[10]. The Jury found in favor of Counterclaimant CDI on its claim of tortious interference with business relations, awarding the Counterclaim-ant CDI $50,000.00 in compensatory damages and $100.00 in punitive damages against Counterdefendant David Aven and awarding $50,000.00 in compensatory damages against Plaintiff Neva, Inc.

Subsequent to the entry of the Jury Verdict, the Episcopal Radio TV Foundation stipulated that it would be liable to Christian Duplications International, Inc. on its cross-claim for any compensatory damages awarded in favor of Plaintiffs against Defendants CDI, CD, Turney, and ICC (Doc. No. 287, filed December 13, 1958). Further, Plaintiffs Neva and Estate of Scourby and Defendant–Counterdefendant International Cassette Corporation ("ICC") filed a Stipulation by which ICC agreed to the entry of judgment against it in the amount of $322,707.00 (Doc. No. 290, filed January 16, 1990).[11]

During the trial, CDI's counterclaim for trademark infringement (Count XII) was settled. Prior to trial, the claim of Neva and Estate of Scourby for copyright infringement (Count VII of Complaint) was severed by the Court to be determined at a later time. (Doc. No. 170, filed March 29, 1989).

Subsequent to the entry of the Jury Verdict, the Court requested that the parties submit memoranda of law and motions describing the issues which remain for the Court's determination. The parties filed extensive documents.[12] The Court finds that this case is now ripe for determination of the following matters:

1. The extensions of time requested by Plaintiffs and Counterdefendants in Docket Entry 279, filed November 16, 1989, and Docket Entry 280, filed November 21, 1989, are GRANTED.

2. The Request by Episcopal Foundation under Local Rule 3.01(d) for Oral Ar-

---

**8.** Neva, Inc. is designated in the Complaint as a Florida corporation whose name was changed to Alexander Scourby Bible Recordings, Inc.

**9.** Although the Jury found that the Plaintiffs proved their claim of federal unfair competition against Defendant, R.B. Turney, no damages were awarded against such Defendant.

**10.** During the course of the trial, the counter-claim claim for violation of the Florida RICO Act, Florida Statute Chapter 895 (Count IX), was dropped in favor of the presentation of such claim under the federal RICO statute.

**11.** Attached to this stipulation, titled Notice of Filing Settlement Agreement between Plaintiffs and Defendant, ICC, was a copy of the settlement agreement between these parties.

**12.** Any issues not preserved in these motions and memoranda are deemed waived.

gument on Pending Post–Trial Motions (Doc. No. 286, filed December 8, 1989) and Request by CDI for Oral Argument on Pending Post–Trial Motions (Doc. No. 288, filed December 18, 1989) are DENIED.

3. Plaintiffs' Motion and Incorporated Memorandum for Expedited Consideration of Post–Trial Motions (Doc. No. 291, filed January 24, 1990) is GRANTED.

4. Plaintiffs' Second Motion and Incorporated Memorandum for Expedited Consideration of Post–Trial Motions (Doc. No. 298, filed April 6, 1990) is GRANTED.

5. As to Plaintiffs' Motion (with incorporated memorandum) for Entry of Judgment, Including Compensatory and Punitive Damages, Treble Damages, Prejudgment Interest, Attorneys' Fees and Costs, Declaratory Judgment, Permanent Injunction, Cancellation of Trademark Registrations and Destruction of Infringing Articles (Doc. No. 273, filed October 16, 1989), Episcopal Foundation's Memorandum in Opposition to Plaintiffs' October 13, 1989 Motion; and Episcopal Foundation's Renewed Motion for Directed Verdict as to Counts III and VI, with Memorandum (Doc. No. 274, filed October 27, 1989), Memorandum of CDI, CD, Turney and ICC in Opposition to Plaintiffs' Motion and Memorandum of October 13, 1989; and Renewed Motion for Directed Verdict, with Memorandum (Doc. No. 276, filed October 31, 1989), CDI's Motion for Directed Verdict on Plaintiffs' Count IV (Copyright Ownership) and Counterclaim Count Ten (Quiet Title Action) and Memorandum of Law on Copyright Ownership Issue (Doc. Nos. 277 and 278, filed October 31, 1989), Plaintiffs' Supplemental Memorandum in Opposition to the Memorandum of CDI, CD, Turney and ICC in Opposition to Plaintiffs' Motion and Memorandum of October 13, 1989; and Renewed Motion for Directed Verdict, with Memorandum (Doc. No. 282, filed November 30, 1989), Plaintiffs' Memorandum in Opposition to the Memorandum of CDI, CD, Turney and ICC in Opposition to Plaintiffs' Motion and Memorandum of October 13, 1989; and Renewed Motion for Directed Verdict, with Memorandum (Doc. No. 283, filed November 30, 1989), Plaintiffs' Memorandum of Law in Opposition to CDI's Motion for Directed Verdict on Plaintiffs' Count IV (Copyright Ownership) and Counterclaim Count Ten (Quiet Title Action) (Doc. No. 284, filed November 30, 1989), Plaintiffs' Memorandum in Opposition to Episcopal Foundation's Renewed Motions for Directed Verdict as to Counts III, IV and VI (Doc. No. 285, filed November 30, 1989), CDI's Notice of Additional Legal Authority (Doc. No. 289, filed December 18, 1989), Plaintiffs' Notice of Intention to File Additional Affidavits in Support of Motion for Attorneys' Fees and Costs or, in the Alternative, Plaintiffs' Motion for Clarification from the Court Regarding the Filing of Affidavits in Support of Plaintiffs' Motion for Attorneys' Fees and Costs (Doc. No. 292, filed January 24, 1990), Plaintiffs' Supplemental Memorandum in Opposition to CDI's Memorandum of Law on Copyright Ownership Issue (Doc. No. 293, filed January 30, 1990), CDI's Response to Plaintiffs' Supplemental Memorandum (Doc. No. 294, filed Feb. 15, 1990), and Motion of Plaintiffs to Strike (Doc. No. 299, filed April 10, 1990), the Court rules as follows:

### I. *On the Claims of Plaintiffs*

Plaintiffs seek the full range of remedies available under 15 U.S.C.A. § 1117(a) (West Supp.1989) for their claim brought under the Lanham Act, 15 U.S.C.A. § 1125(a) (West Supp.1989). The Defendants named in Count I, the Lanham Act claim, CDI, CD, Turney, and ICC [hereinafter "Lanham Act Defendants" when referred to collectively as to Count I] contend that Plaintiffs are not entitled to the full range of remedies available in 15 U.S.C.A. § 1117(a). Under section 1117, subject to the principles of equity, a prevailing plaintiff is entitled to recover defendant's profits, any damages sustained by plaintiff, the costs of the action, and in exceptional cases, the Court may award reasonable attorney fees to the prevailing party. In addition, according to the circumstances of the case, the Court may increase the amount of actual damages up to three times the amount awarded. 11 U.S.C.A. § 1117(a).

■ Defendants argue that as Plaintiffs' claim is based on false advertising rather than infringement, they are not entitled to

the full range of remedies available in section 1117, citing *Burndy Corp. v. Teledyne Indus., Inc.,* 584 F.Supp. 656 (D.Conn.), aff'd, 748 F.2d 767 (2d Cir.1984). In *Burndy,* the District Court held that section 1117 did not apply to section 1125(a) claims based on false advertising. *Burndy,* 584 F.Supp. at 667. This conclusion was based on the language of section 1117 suggesting that section 1117 is only applicable in actions involving violations of registered marks.[13] The persuasiveness of this citation is lessened by the Second Circuit's treatment of the case on appeal. Rather than determining whether section 1117 applied in false advertising claims, the Second Circuit Court, assuming that it did, reasoned that an accounting of defendant's profits was not appropriate under the facts of the case. *Burndy,* 748 F.2d at 772.

The Eleventh Circuit has partially resolved the issue of whether section 1117 applies in section 1125(a) claims in *Rickard v. Auto Publisher, Inc.,* 735 F.2d 450 (11th Cir.1984), which the Court in *Burndy* cited in support of its assumption. *Burndy,* 748 F.2d at 772 n. 3. In *Rickard,* the Court held that the section 1117 remedies applied in a section 1125(a) claim based on infringement of an unregistered mark. *Rickard,* 735 F.2d at 459. The Court held that it must look beyond the plain meaning of the statutory language because of the inconsistent interpretations that various courts have given to section 1117. *Id.* at 455. After finding that the legislative history of section 1117 was not dispositive, the Court concluded that section 1117 applies to section 1125(a) actions involving unregistered trademarks because the purpose and intent of the Lanham Act was to simplify trademark practice, to provide uniform regulations for trademarks, and to provide the greatest protection possible for trademarks. *Id.* at 457. In *Rickard,* plaintiff proceeded under the part of section 1125(a) prohibiting a "false designation of origin". In the present case the action proceeded

under the part of section of 1125(a) prohibiting a "false or misleading representation of fact". Based on the reasoning in *Rickard,* there is no reason, under the circumstances of the present case, why Plaintiffs should not be entitled to the section 1117 remedies, if appropriate.

**(A)** *Increased damages pursuant to 15 U.S.C. § 1117(a)*

The Court denies the Application of Plaintiffs to increase the amount of damages awarded under the Lanham Act, 15 U.S.C.A. § 1117(a), as the Court does not find that the amount of recovery based on Defendants' profits is inadequate to compensate the Plaintiffs for their injuries. *Burger King Corp. v. Mason,* 710 F.2d 1480, 1495 (11th Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984); *Playboy Enters., Inc. v. Baccarat Clothing Co.,* 692 F.2d 1272, 1276 (9th Cir. 1982).

**(B)** *Prejudgment interest as to Counts I and VI of the Third Amended Complaint*

The Plaintiffs' Application for prejudgment interest against Defendants, Episcopal Foundation, CDI, CD and ICC on Counts I and VI is DENIED. As to Count I, Plaintiffs cite *Ramada Inns, Inc. v. Gadsden Motel Co.,* 804 F.2d 1562 (11th Cir.1986) for support of an award of prejudgment interest in a Lanham Act claim. In *Ramada Inns,* the Court simply stated that the district court did not abuse its discretion in awarding prelitigation interest. *Id.* at 1568. The opinion does not determine the propriety or standards for an award of prejudgment interest in a Lanham Act case. Absent either authority in the Eleventh Circuit on this issue or a persuasive argument from Plaintiffs, the Court declines to award Plaintiffs prejudgment interest on their Lanham Act claim.

---

**13.** Section 1117 states, in pertinent part: "When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled ... to recover...." 15 U.S.C.A. § 1117(a) (West Supp.1989). This section, effec-

tive November 16, 1989, has been amended by adding the following language after "Trademark Office": ",or a violation under section 1125(a) of this title." 11 U.S.C.A. § 1117(a) (West Supp. 1990). Thus under the amendment, it is clear that section 1117 applies in false advertising claims brought under section 1125(a).

*But see Gorenstein Enters., Inc. v. Quality Care–USA*, 874 F.2d 431, 436–37 (7th Cir.1989) (In context of Lanham Act case, prevailing party presumed entitled to prejudgment interest). Thus the award of prejudgment interest is DENIED.

■ As to Count VI for breach of contract, under Florida law, a prevailing party is entitled to prejudgment interest if the verdict fixes damages as of a prior date. *Argonaut Ins. Co. v. May Plumbing Co.*, 474 So.2d 212 (Fla.1985). In the present case, the jury verdict did not fix damages as of a date prior to the verdict. Therefore the damages were not liquidated, and Plaintiffs are not entitled to prejudgment interest as to the breach of contract claim.

(C) *Attorneys Fees and Costs pursuant to 15 U.S.C. § 1117*

■ Under section 1117, the Court may award reasonable attorney fees to a prevailing party under the Lanham Act in "exceptional" cases. 15 U.S.C.A. § 1117(a) (West Supp.1989) A case is exceptional if the conduct of the defendant can be characterized as malicious, fraudulent, deliberate, and willful. *Dieter v. B & H Indus.*, 880 F.2d 322, 329 (11th Cir.1989), *petition for cert. filed,* (U.S. Dec. 16, 1989) (No. 89–1193). Even if a court finds that the case is exceptional, however, the award of attorney fees under the Lanham Act is within the court's discretion. *Id.*

■ The circumstances of this case justify an award of attorney fees as to the Lanham Act claim. The jury found that the actions of the Lanham Act Defendants were willful (Verdict Question 3(b)(i-iv). Defendant Turney was advised in 1977 that he must obtain permission from the Episcopal Foundation and Scourby's agent before using Scourby's name. The Episcopal Foundation refused to give Turney permission. After the retirement of its director, Caroline Rakeshaw, who had negotiated with Scourby for the narrations, the Episcopal Foundation assigned its rights to use Scourby's name to Turney's corporation, CDI in 1982. Turney negotiated a license, and subsequently, two assignments to CDI, of which he was president, and then obtained a sublicense from ICC. Turney did not, however, contact any representative of Scourby for permission before his companies began using the Scourby name.

■ Lanham Act Defendants make three arguments against an award of attorney fees. (Defendants do not refute the conclusion that the jury's finding of willfulness makes this case "exceptional".) First, Lanham Act Defendants argue that Plaintiffs are not entitled to attorney fees because they are not prevailing parties in the litigation as taken as a whole. It is true, as Lanham Act Defendants assert, that one Plaintiff, Neva, Inc., and its President, David Aven, had Judgments entered against them on CDI's Counterclaims, (Counts XI and XII), and that Plaintiffs stipulated to a directed verdict as to Count V, but this does not mean that Plaintiffs are not prevailing parties on their Lanham Act claim. Plaintiffs have prevailed on that claim, and they are only entitled to attorney fees for legal expenses incurred in prosecuting the claim arising under the Lanham Act. Annotation, *Award of Attorneys' Fees Under § 35(a) of Lanham Act (15 USCS § 1117(a)) Authorizing Award in "Exceptional Cases",* 82 A.L.R.Fed. 143, 198 (1987) (citing *Elnickey Enterprises, Inc. v. Spotlight Presents, Inc.*, 213 U.S.P.Q. 855 (S.D.N.Y.1981)).

■ Second, Lanham Act Defendants argue that it is premature to consider attorney fees because Count VII of the Third Amended Complaint remains to be tried. As this Court holds that Plaintiffs are only entitled to attorney fees for their claim arising under the Lanham Act, an award of attorney fees for the Lanham Act claim is not premature.

■ Third, Lanham Act Defendants argue that the judgment against Neva and Aven in Count XI of the Counterclaims renders Plaintiffs' hands unclean. This Court holds that the verdict against Neva and Aden is insufficient to give Plaintiffs unclean hands in the Lanham Act claim. Thus Plaintiffs are entitled to attorney fees for prosecuting their claim arising under the Lanham Act, and they may submit the necessary papers within ten days from the date of this Order supporting the amount

of an award of attorney fees necessary for the prosecution of the Lanham Act claim.

### (D) *Declaratory Judgment on Count IV of the Third Amended Complaint*

In Count IV of the Third Amended Complaint, Neva and the Estate of Scourby demand against Defendant CDI, CD, Turney, ICC, and Episcopal Foundation a declaratory judgment that the copyright to the two narrations made by Scourby is owned by the Estate of Alexander Scourby and that Alexander Scourby granted a non-transferable, limited license to the Episcopal Foundation for use of the narration on a non-profit basis for use throughout the "Episcopal Community," retaining in Mr. Scourby the commercialization and all other rights to the narration.

 The Copyright Act of 1909 as amended applies in the present case because the sound recordings were fixed prior to the effective date of the Copyright Act of 1976. *See Norris Indus., Inc. v. International Tel. & Tel. Corp.*, 696 F.2d 918, 920 (11th Cir.), *cert. denied*, 464 U.S. 818, 104 S.Ct. 78, 78 L.Ed.2d 89 (1983). A federal statutory copyright does not subsist from the moment the work is created. Upon the creation of a work, the author of the work is vested with a copyright under state common law until the work is published. Upon publication the author becomes the owner of the federal statutory copyright if the work is published with a proper copyright notice, but if the work is published without proper copyright notice, then the work enters the public domain. *Donald Frederick Evans & Assocs., Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 905 (11th Cir.1986); *Roy Export Co. v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1101 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).

The first issue before the Court is to determine who is the author of the narrations. "As a general rule, the author is the party who actually creates the work, that is, the person who translates an idea into a fixed, tangible expression entitled to copyright expression." *Community for Creative Non–Violence v. Reid*, —— U.S. ——, 109 S.Ct. 2166, 2172, 104 L.Ed.2d 811 (1989). Under this definition, the evidence at trial shows that Alexander Scourby would be the author of the narrations as he is the person who took the idea of recording the bible and turned the idea into a tangible expression.

### WORK FOR HIRE DOCTRINE

 The Episcopal Foundation argues, however, that based on the work for hire doctrine the Episcopal Foundation is the author of the copyright. Under the work for hire doctrine, one (the hiring party) who solicits another (the commissioned party) to create a work for pay is presumed to be the author and copyright owner unless the express or implied terms of the contract between the parties reserve the copyright to the commissioned party. *Community For Creative Non–Violence*, —— U.S. ——, 109 S.Ct. 2166, 2175, 104 L.Ed.2d 811 (1989); *Murray v. Gelderman*, 566 F.2d 1307, 1309 (5th Cir.1978); *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28, 30–31 (2d Cir.1939), *cert. denied*, 309 U.S. 686, 60 S.Ct. 891, 84 L.Ed. 1029 (1940). "The crucial element in this determination appears to be whether the work was created at the employer's insistence and expense, or, in other words, whether the motivating factor in producing the work was the employer who induced its creation." *Murray v. Gelderman*, 566 F.2d 1307, 1310 (5th Cir.1978).

 In the present case, the facts adduced at the trial show that the narrations were created at the insistence and expense of the Episcopal Foundation; thus the work for hire doctrine creates a rebuttable presumption that the Episcopal Foundation is the author of the narrations and the copyright owner. This presumption shifts the burden of persuasion to Plaintiffs to prove by a preponderance of the evidence that the expressed or implied terms of the contract show an intention that the copyright should remain with Scourby. *See Murray*, 566 F.2d at 1311; *Real Estate Data, Inc. v. Sidwell Co.*, 809 F.2d 366, 371 (7th Cir.1987).

 As Plaintiffs have met this burden, the Court finds that Scourby remained the author and copyright owner of the sound recordings. The express terms of the con-

tract between Scourby and the Episcopal Foundation do not address the parties' intent as to who would be the copyright owner of the sound recordings. The closest allusion to copyrights during the time that the contracts were negotiated or performed, was a reference in a letter from the Episcopal Foundation to its ownership of world-wide audio rights in both narrations. The reference to world-wide rights is not inconsistent with the conclusion that the parties intended Scourby to remain the copyright owner. The evidence presented at trial shows that the parties did not intend to provide the Episcopal Foundation with the right to market the narrations world-wide without limitation. That reference merely shows that as to its license to publish the narrations for its non-profit purposes, the Episcopal Foundation had the world-wide rights.

It is clear that the implied terms of the contract evidence an intention that Mr. Scourby should remain the copyright owner of the sound recordings. The express terms of the contract and the negotiations between the parties show that the narrations were to be used only for the non-profit purposes of the Episcopal Foundation. The Court finds that as there is such a clear manifestation of the parties' intent to limit the rights of the Episcopal Foundation, it may be implied that the parties intended that the copyright would remain with Scourby. *Cf.* 1 M. Nimmer & D. Nimmer, Nimmer on Copyright § 5.03[D], at 5–32.13 (1989) (under 1909 Act, agreement reserving rights in commissioned party could be implied).

■ The parties' intent that Mr. Scourby should remain the copyright owner is corroborated by the custom and usage in the entertainment industry and by the size of Mr. Scourby's fee. Custom and usage in an industry are relevant to the determination whether the work for hire presumption has been rebutted. *May v. Morganelli–Heumann & Assocs.*, 618 F.2d 1363, 1369 (9th Cir.1980). Plaintiffs' expert witness, William M. Milom, testified that it is customary for an artist who grants non-profit rights in an artistic work to a non-profit entity to retain all of the rights to the work and that the non-profit entity receiving the

rights should not engage in commercialization of the creation. Mr. Milom testified that the custom in situations where a celebrity creates a work for the benefit of a non-profit organization was that the copyright remained with the celebrity and that the non-profit organization received a limited license according to the parties' intent.

■ A reduced fee for creating a work indicates that the parties intended that the commissioned party was to remain the owner of the copyright to the commissioned work. *Real Estate Data, Inc. v. Sidwell Co.*, 809 F.2d 366, 375 (7th Cir. 1987); *W.H. Anderson Co. v. Baldwin Law Pub. Co.*, 27 F.2d 82, 88 (6th Cir.1928). The Episcopal Foundation paid Mr. Scourby $5,000 and $10,000 for narrating the Old and New Testaments respectively. Ms. Oscard and Mr. Spiro testified that these fees were reduced fees for a work of this nature and that the fees were reduced because the parties understood that the Episcopal Foundation's use of the narrations was limited to non-profit purposes.

Further, testimony from Robert Spiro of the American Federation of TV and Radio artists (AFTRA) shows that the parties' did not intend to give commercial rights to the Episcopal Foundation. Mr. Spiro testified that a union waiver was granted for Scourby, a union member, to do the narration for the Episcopal Foundation without requiring payment of union fees by Scourby because the narration would not be used or sold commercially and because it was deemed to be a significant contribution by Scourby. The evidence reflected other letters between Rakestraw and Spiro confirming this understanding.

Thus the Court concludes that the presumption created by the work for hire is rebutted because there is sufficient evidence to show that the parties intended that Scourby retain ownership of the copyright of the narrations. Therefore the estate of Alexander Scourby is the copyright owner of the sound recordings, and the Episcopal Foundation is the holder of a license for the non-profit rights in the sound recordings. The license, however, is not limited to the non-profit use of the

narrations by the Episcopal Foundation to the "Episcopal Community" or to the blind and physically handicapped as is argued by Plaintiffs. Mr. Scourby's personal efforts to foster the Foundation's sales of the narrations generally; i.e., at Rich's Department Store in Atlanta and in an interview with Barbara Walters on television during the Today Show at Thanksgiving, as well as other evidence, show that the parties intended a market broader than just the "Episcopal Community" or the blind and physically handicapped. The Court finds that the license to the narrations of the Episcopal Foundation must be restricted to the Episcopal Foundation's own non-profit activities (as opposed to some other type of non-profit activities), with emphasis to the blind and physically handicapped.

■ As to a restriction in transfer of ownership, no such limitation was discussed in the express words of Mr. Scourby and Ms. Caroline Rakeshaw for the Episcopal Foundation at the time the contract was created. From the testimony, however, it is clear that Scourby was persuaded to make the recordings, among other reasons, because of the Foundation's non-profit status, because it was affiliated with the Episcopal Church, and because the recordings would be used for the blind and physically handicapped. Mrs. Scourby testified to her husband's favorable view of the Episcopal parish and to her husband's previous contributions of his talents to charitable efforts for the blind and physically handicapped. Since the agreement was that the narration would be used for the non-profit purposes of the Episcopal Foundation, transfer to any entity that would exploit the narrations for profit or that would have any purpose other than the non-profit purposes of the Episcopal Foundation would be improper.

This conclusion comports with the law of licenses under the 1909 Copyright Act. As the Court concludes that the Episcopal Foundation merely received a license in the sound recordings, the Episcopal Foundation has no right to resell, sublicense, or assign its rights in the license. *Harris v. Emus Records Corp.*, 734 F.2d 1329, 1333 (9th Cir.1984); 3 M. Nimmer & D. Nimmer, Nimmer on Copyright § 10.01[C][4], at 10–1 (1989).

### JOINT AUTHORSHIP

■ Defendants argue that even if Scourby retained the copyright, the doctrine of joint authorship, between Caroline Rakestraw and Scourby, applies, and thus Plaintiffs' only remedy is an accounting, excluding all sales within the consent granted by Scourby to the Episcopal Foundation. The essence of joint authorship is a joint laboring in furtherance of a preconcerted common design. *Edward B. Marks Music Corp. v. Jerry Vogel Music Co.*, 140 F.2d 266, 267 (2d Cir.1944); 1 M. Nimmer & D. Nimmer, Nimmer on Copyright § 6.03, at 6–6 (1989). This doctrine is inapplicable under the facts of the present case because there was neither a preconcerted common design nor a joint laboring. There was no evidence that the parties intended that their contributions be merged so as to create a joint work. Further, the only claim to authorship of Caroline Rakestraw is, at most, the act of setting up the recording session.

> If the act of 'setting up the recording session' were the record producer's only basis for claiming original contribution to the recording, and hence of 'authorship,' it would be ill based indeed. This is no more an act of 'authorship' than is the act of one who makes available to a writer a room, a stenographer, a typewriter, and paper.

1 M. Nimmer and D. Nimmer, Nimmer on Copyright § 2.10[A][2][b], at 2–146 (1989).

### PUBLICATION WITHOUT COPYRIGHT NOTICE IN SCOURBY'S NAME

■ CDI argues that if the Court finds that Scourby is the sole owner of the copyright, then the narrations are in the public domain because the tapes were published without copyright notice in Scourby's name. The Episcopal Foundation placed its copyright "Catacomb Cassettes" on the tapes, and a copy was furnished to Ms. Oscard, Mr. Scourby's agent. The tapes sold by CDI and ICC had the Episcopal Foundation's copyright on them. The

tapes never contained a copyright notice in Scourby's name. Historically, publication by a licensee, one who acquires only partial rights in a copyrighted work, injected the work into the public domain unless the work was published with notice indicating the licensor's copyright. The rationale behind this theory is that a copyright contains a host of indivisible rights to which there can be only one owner. *Goodis v. United Artists Television, Inc.*, 425 F.2d 397, 400 (2d Cir.1970). Under this indivisibility theory, the copyright of Scourby would be in the public domain, despite publication of the narrations with a copyright in the Episcopal Foundation's name.

In *Goodis v. United Artists Television, Inc.*, 425 F.2d 397 (2d Cir.1970), the Court ameliorated the harsh effect of the indivisibility theory under some circumstances, which are applicable in the present case. Goodis, the author of the novel "Dark Passage," made arrangements with a publisher for his book to be printed in April, 1946. Before the book was published, Goodis arranged to have the book serialized in the periodical "The Saturday Evening Post". The book publisher agreed to postpone distribution of the book until October 1946, after the serialization. "Dark Passage" was serialized in eight issues of the periodical. Each issue contained a single copyright notice in the periodical's name, but there was no copyright notice in Goodis's name. *Id.* at 399. On December 20, 1945, Goodis sold the exclusive motion picture rights in the novel to Warner Brothers.

Warner Brothers created and distributed a film based upon the novel. After the film was exhibited in the theater and television, Warner Brothers assigned its contract rights to United Artists, which created a television film series based on the novel. The executors of the estate of Goodis, arguing that the motion picture rights did not include the television rights to "Dark Passage", brought an infringement action against United Artists. United Artists defended the suit on the basis, among others, that "Dark Passage" fell into the public domain when it was published in serialized form because the publisher of the periodical, who only obtained partial rights in the novel, thus making it a licensee, published "Dark Passage" without a copyright in the licensor's name.

The Court declined to apply the indivisibility theory so to invalidate the author's copyright. The Court held that copyright notice of the Saturday Evening Post, although a licensee, protected the copyright of the author. The Court concluded that "where a magazine has purchased the right of first publication under circumstances which show that the author has no intention to donate his work to the public, copyright notice in the magazine's name is sufficient to obtain a valid copyright on behalf of the beneficial owner, the author or proprietor." *Id.* at 399, *quoted in, Abend v. MCA, Inc.*, 863 F.2d 1465, 1469 (9th Cir. 1988), *cert. granted sub nom. Stewart v. Abend*, —— U.S. ——, 110 S.Ct. 47, 107 L.Ed.2d 16 (1989). The rationale behind *Goodis* is the prevention of an unintentional forfeiture of an author's copyright "due to publication with copyright notice in the 'wrong' name." *Roy Export Co. v. Columbia Broadcasting System, Inc.*, 672 F.2d 1095, 1104 (2d Cir.), *cert. denied*, 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). The exception to the indivisibility doctrine, as formulated in *Goodis*, has been accepted within the law of the Eleventh Circuit. *Fantastic Fakes, Inc. v. Pickwick Int'l, Inc.*, 661 F.2d 479 (5th Cir. Unit B Nov. 1981).

Applying the rationale of *Goodis* to the present case, publication of the narrations with the Episcopal Foundation's copyright protected Scourby's copyright from being injected into the public domain. The facts of the present case show that Scourby did not intend to forfeit ownership of the copyright to the sound recordings. A similar result was reached in *Arthur Retlaw & Assocs., Inc. v. Travenol Laboratories, Inc.*, 582 F.Supp. 1010 (N.D.Ill.1984), which involved a dispute as to the ownership of the copyright to a newsletter entitled "Thyroid Today". Travenol hired a subsidiary of Arthur Retlaw to publish the newsletter. The first six issues of the newsletter bore copyright notice in the name of the publisher rather than Travenol. Unlike the Court in the present case, the Court held that the

presumption created by the work for hire doctrine had not been rebutted, thus finding that Travenol was the author and owned the copyright in the newsletter. The Court, citing *Goodis* and *Fantastic,* said that the copyright notice in the publisher's name protected the true owner's copyright. *Arthur Retlaw & Assocs.,* 582 F.Supp. at 1013–14. Thus in the present case, the publication of the tapes with the copyright notice of the Episcopal Foundation protected the true copyright owner: Alexander Scourby.

### COPYRIGHT OFFICE

■ CDI argues that Mr. Scourby cannot own the copyright because the contentions of the Plaintiffs have been rejected by the Copyright Office. This argument is without merit. The Copyright Office refused to register a copyright in the name of the estate of Mr. Scourby, but the Copyright Office did not take a position as to the ownership of the copyright, and admitted as much in a letter: "The question of who owns the copyright in this recording ... must be decided outside our office, possibly by a court." (Doc. No. 278, Ex. B, letter dated Aug. 19, 1989). Thus the failure of the Copyright office to register the copyright in the name of the estate of Mr. Scourby has no binding effect upon this Court's decision as to who owns the copyright in the sound recordings.

### STATUTE OF LIMITATIONS, LACHES, ESTOPPEL, AND WAIVER

■ Relying on *Borden v. Katzman,* 881 F.2d 1035 (11th Cir.1989), CDI argues that state law pertains to the issue of copyright ownership and that the claim of the Plaintiffs is barred by the statute of limitations, Florida Statute § 95.11(6) (1989). This argument is without merit because it misinterprets the holding in *Borden.* In *Borden,* the Court concluded that there was no federal jurisdiction and that state law applied rather than federal copyright law because there was neither a claim for copyright infringement nor an issue that involved construction of the copyright act. *Id.* at 1038. In *Borden* as both parties agreed that the plaintiff was the copyright owner, there was no dispute as to copyright ownership. In the present case there is a dispute as to copyright ownership; therefore in resolving Count IV, the Court has been required to determine the proper construction of the copyright act to decide who owns the copyright to the sound recordings. Thus the holding in *Borden* is inapplicable in the present case.

■ Defendants assert the affirmative defenses of laches, estoppel, and waiver, but present the Court with no relevant case law as to any of these issues. While these affirmative defenses may be properly asserted in an infringement action, they are not properly asserted in this action to determine the ownership of the copyright. The Court has determined that Mr. Scourby retained the ownership in the copyright and that the copyright of the Episcopal Foundation protected his copyright. These issues are inapplicable in the present action for a declaratory judgment to determine ownership of the copyright because under the law, Mr. Scourby has been considered the statutory copyright owner since the first narration was published. This conclusion, however, does not bar the Defendants from asserting these defenses in a copyright infringement action.

(E) *Injunctive Relief Including Cancellation of United States Trademark Registration of CDI*

■ Plaintiff requests a continuing permanent injunction prohibiting the use of the Scourby name and phrase "Authorized Alexander Scourby's Latest Narration by CDI, CD, Turney and ICC pursuant to 15 U.S.C. § 1116(a) of the Lanham Act, Florida Statute § 540.08, and Florida Statute § 495.151, on the ground that such Defendants continue to use or authorize the use of the name and phrase in derogation of the jury's verdict. Under 15 U.S.C.A. § 1116(a) (West Supp.1989), a plaintiff who brings an action pursuant to section 1125(a) is entitled to permanent injunctive relief if the plaintiff succeeds on the merits of his or her claim and if the equities involved favor injunctive relief. *Banff, Ltd. v. Federated Dep't Stores, Inc.,* 657 F.Supp. 336, 338 (S.D.N.Y.1987).

In Count I of the Complaint, the jury found for Plaintiffs on their claim based on 15 U.S.C.A. § 1125(a) (West 1989) against the Lanham Act Defendants. In addition, the jury found that the acts of the Lanham Act Defendants were willful. Under the circumstances of the present case, equity favors granting an injunction. Monetary relief will not adequately protect the Plaintiffs from future violations. Thus Defendants CDI, CD, Turney, and ICC are enjoined from using the Scourby name, the phrase "Authorized Alexander Scourby's Latest Narration", and any other reference to Alexander Scourby for purposes of trade or for any commercial or advertising purpose. As the Court has granted a permanent injunction under the Lanham Act, it is unnecessary to determine the propriety of an injunction under any of Plaintiffs' other claims.

■ Plaintiffs request that the Court cancel CDI's Trademark Registration for the mark "Authorized Latest Alexander Scourby Narration" and send notice of such cancellation to the United States Commissioner of Trademarks in Washington, D.C. The Court is empowered to cancel a trademark where the validity of the mark is placed in issue. *Gear, Inc. v. L.A. Gear California, Inc.*, 670 F.Supp. 508, 512 (S.D. N.Y.1987). A trademark obtained by fraud is subject to cancellation. *Id.* Plaintiffs argue that CDI fraudulently obtained the trademark registration by representing Scourby was dead when he was not. While there does appear to be an error in the statement of his date of death made by an amendment to the trademark registration dated November 20, 1986, the Court declines to find on this basis that there was a fraud in obtaining such registration.

■ The Court may also cancel a trademark registration within five years from the initial date of registration for any reason that would have been sufficient to deny the initial registration. *International Mobile Machines Corp. v. International Telephone & Telegraph Corp.*, 800 F.2d 1118, 1119 (Fed.Cir.1986). Plaintiffs also request cancellation of the trademark registration because the trademark falsely suggests sales of the narrations by CDI are authorized by Alexander Scourby. In

Count I, on the Lanham Act claim of Plaintiffs the jury found that CDI's trademark was a false misrepresentation and that it was made wilfully (Verdict Q 3(a)-(b). As this would have been a sufficient basis to deny registration initially in July 1987, the Court finds that it is proper to cancel the trademark in the present case; therefore under the authority of 11 U.S.C.A. § 1119 (West 1982), the registration of CDI for the mark "Authorized Alexander Scourby Narration" shall be cancelled. The clerk of the court shall certify this Order to the Commissioner of the Patent and Trademark Office.

(F) *Destruction of infringing articles pursuant to 15 U.S.C. § 1118*

■ Section 1118 empowers a court to order the violating party to have the infringing articles "delivered up and destroyed." 15 U.S.C.A. § 1118 (West Supp. 1989). Plaintiffs concede that there is no case holding that section 1118 applies in an action brought pursuant to section 1125(a) for an unregistered mark, but Plaintiffs argue that the reasoning in *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450 (11th Cir.1984) makes section 1118 applicable in the present case. Further, effective November 16, 1989, all remedies available under sections 1116, 1117, and 1118 of the Lanham Act will be expressly applicable to section 1125(a) actions. Trademark Law Revision Act of 1988, Pub.L. No. 100–667, § 130, 102 Stat. 3945, 3948 (1988). Even assuming, however, that section 1118 is applicable to the present case, such relief is not warranted under the circumstances of the present case. As the Court has issued an injunction against Defendants CDI, CD, Turney, and ICC, the rights of Plaintiffs are adequately protected, and destruction of the narrations that are now under the control of the Lanham Act Defendants is unnecessary. *Bonanza Int'l, Inc. v. Double "B"*, 331 F.Supp. 694, 696 (D.Minn. 1971).

(G) *Joint and severable liability of Defendants*

This relief is denied as the jury was asked specifically to assess the liability of

each Defendant in the verdict form. The jury carefully considered the actions of each Defendant. The damages awarded are not joint and severable.

### II. Motions of Episcopal Radio TV Foundation, Inc.

As to Episcopal Foundation's Memorandum in Opposition to Plaintiffs' October 13, 1989 Motion; and Episcopal Foundation's Renewed Motion for Directed Verdict as to Counts III and VI, with Memorandum (Doc. No. 274, filed October 27, 1989), and Plaintiffs' Memorandum in Opposition to Episcopal Foundation's Renewed Motions for Directed Verdict as to Counts III, IV and VI (Doc. No. 285, filed November 30, 1989), the Court rules as follows:

Defendants have renewed several Motions for Directed Verdicts. "A Motion for directed verdict will be granted only if, viewing the evidence in its entirety and drawing all reasonable inferences in favor of the nonmoving party, no reasonable jury could reach a contrary verdict." *Smith v. United States*, 894 F.2d 1549, 1552 (11th Cir.1990). Under this standard, the Court denies each Motion for Directed Verdict.

Episcopal Foundation argues that a directed verdict on Count III should be granted because Alexander Scourby gave his consent for the use of his pictures and name to the Episcopal Foundation. The Court declines to grant such Motion because the use of the likeness and name of Alexander Scourby was for a limited non-profit purpose as discussed above, and the Episcopal Foundation allowed and supported the use of Scourby's name and likeness contrary to this limitation. Further, the jury found against the Defendant Episcopal Foundation on its affirmative defenses, and this finding is supported by the evidence. Therefore the motion for directed verdict on Count III (Doc. No. 274) is DENIED.

 Episcopal Foundation's Motion for Directed Verdict as to Count VI (Doc. No. 274) is also DENIED. Episcopal Foundation argues that the jury verdict is only

advisory, and that this Court should find that a use restriction did not exist in the contract. The issue of contract interpretation was properly submitted to the jury in the present case because the contract was unclear and ambiguous. *Fabrica Italiana Lavorazione Materie Organiche, S.A.S. v. Kaiser Aluminum & Chemical Corp.*, 684 F.2d 776, 780 (11th Cir.1982). As the content of the contract was based on oral and written evidence, it was subject to more than one construction. Plaintiffs and Defendants vigorously took issue with each other as to what constituted the agreement. Further, submission of the issue of contract interpretation to the jury was proper in the present case because it involved reference to extrinsic facts. *Location 100, Inc. v. Gould S.E.L. Computer Systems, Inc.*, 517 So.2d 700, 705 (Fla.Dist. Ct.App.1987), *rev. denied*, 528 So.2d 1182 (Fla.1988).[14]

 Further, the jury found against the Episcopal Foundation on its affirmative defenses of laches, waiver, estoppel and the statute of limitations. The statute of frauds does not apply where, as here, one party to the contract, Mr. Scourby, has fully performed all his duties and obligations. *See, e.g., Elliott v. Timmons*, 519 So.2d 671, 672 (Fla.Dist.Ct.App.), *rev. denied*, 525 So.2d 878 (Fla.1988); *Hiatt v. Vaughn*, 430 So.2d 597, 598 (Fla.Dist.Ct. App.1983).

 The Episcopal Foundation argues that there is no basis for the $172,000 breach of contract damages received by Plaintiffs. This amount represents the amount CDI paid the Episcopal Foundation for the right to distribute and sell the Alexander Scourby narrations for profit without limitations. Generally, in a breach of contract action, a prevailing plaintiff's damages are measured as the reasonable amount of lost profits, which are ascertainable, that would have resulted had there been no breach and had the contract been performed. *Ed Skoda Ford, Inc. v. P. & P. Paint & Body Shop, Inc.*, 302 So.2d 461,

---

**14.** In any event, even if the jury's verdict on Count VI was advisory, as the evidence supports the jury's verdict that a use restriction existed and that the Episcopal Foundation breached the use restriction, the Court would adopt the jury's verdict.

461–62 (Fla.Dist.Ct.1974), *cert. denied,* 315 So.2d 179 (Fla.1975). But where damages are unliquidated and not susceptible to measurement by a specific standard, a jury has considerable discretion in the amount of damages awarded in a breach of contract action. *Odoms v. Travelers Ins. Co.,* 339 So.2d 196, 198 (Fla.1976). As the breach of contract in the present case was caused when the Episcopal Foundation improperly assigned its rights to use the narrations to a commercial exploiter, CDI, an award of lost profits is not ascertainable or applicable, and the jury's award of damages in the same amount as the amount of consideration paid by CDI to the Episcopal Foundation is appropriate and within the jury's discretion.

III. *Motions of Christian Duplications International, Inc., Christian Duplications, Inc., R.B. Turney and International Cassette Corporation*

As to the Memorandum of CDI, CD, Turney and ICC in Opposition to Plaintiffs' Motion and Memorandum of October 13, 1989; and Renewed Motion for Directed Verdict (Doc. No. 276, filed October 31, 1989), CDI''s Memorandum of Law on Copyright Ownership Issue (Doc. No. 278, filed October 31, 1989), and Plaintiffs' Memorandum of Law in Opposition to CDI's Motion for Directed Verdict on Plaintiffs' Count IV (Copyright Ownership) and Counterclaim Count Ten (Quiet Title Action) (Doc. No. 284, filed November 30, 1989); Plaintiffs' Supplemental Memorandum in Opposition to the Memorandum of CDI, CD, Turney and ICC in Opposition to Plaintiffs' Motion and Memorandum of October 13, 1989; and Renewed Motion for Directed Verdict, with Memorandum (Doc. No. 282, filed November 30, 1989); and Plaintiffs' Memorandum in Opposition to the Memorandum of CDI, CD, Turney and ICC in Opposition to Plaintiffs' Motion and Memorandum of October 13, 1989; and Renewed Motion for Directed Verdict, with Memorandum (Doc. No. 283, filed November 30, 1989), the Court rules as follows.

The request of CDI, CD, Turney and ICC to set aside the punitive damages awarded by the Jury and to enter a directed verdict as to Count III of the Third Amended Complaint is DENIED.

■ The Motion for Directed Verdict as to Count I of the Third Amended Complaint is DENIED. In support of its Motion for a Directed Verdict as to Count I, Defendants, citing *Harper House, Inc. v. Thomas Nelson, Inc.,* 889 F.2d 197 (9th Cir.1989), argue that Plaintiffs are not entitled to any recovery because they have not shown that they suffered any injury caused by the Lanham Act Defendants' conduct. In *Harper House, Inc.,* plaintiff brought a Lanham Act claim against defendant based on a theory of deceptive advertising. The basis of the claim was that the defendant, a manufacturer of notebook organizers, advertised one type of a notebook organizer but sold another type. The Court reversed the jury's award of damages to plaintiff, a competitor of defendant, because the plaintiff failed to present evidence of some injury resulting from the defendant's deceptive advertising. *Id.* at 209–10.

*Harper* is distinguishable from the present case because Plaintiffs here have shown that they have suffered an injury caused by Defendants' conduct. Plaintiffs have been injured by being deprived of their right to control the use of a commercially valuable asset, the name of Alexander Scourby. *Cf. Zim v. Western Publishing Co.* 573 F.2d 1318, 1327 n. 19 (5th Cir.1978). Thus as Plaintiffs have been injured by Defendants' false advertising, they are entitled to recovery under 15 U.S.C.A. § 1117.

CDI argues that the jury award of $1,234,837 to Plaintiffs is too high, and that it is equitable for the Court to reduce this award. This amount represented an accounting of the profits of CDI and ICC. Under 15 U.S.C.A. § 1117(a), this award is subject to equitable evaluation, and the Court has discretion to reduce the amount of the award that is based on Defendants' profits. 2 J.T. McCarthy, Trademarks and Unfair Competition § 30.28(B), at 516 (1984). Based on CDI's arguments, the Court declines to reduce the verdict of the jury as to Count I.

■ The Lanham Act Defendants make several arguments as to why the Court should reduce the jury verdict. First, the Lanham Act Defendants argue that Plaintiffs are not entitled to an accounting of Defendants' profits because Plaintiffs cannot show that Defendants' actions caused any lost sales to Plaintiffs. Plaintiffs, however, need not show that it has suffered actual damages, through loss sales, to obtain an award reflecting the Defendants' profits under section 1117. *See Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir.1988). In *Mason*, the Court stated that an accounting of a defendant's profits is permissible without a showing of lost sales by the plaintiff because it furthers the Lanham Act's purpose of making violations less profitable by depriving the defendant of being unjustly enriched and by providing a deterrent against future violations. This rationale is applicable in the present case. The jury found that Defendants willfully violated the Lanham Act, profiting at Plaintiffs expense. Therefore, the Court does not find that a reduction of Plaintiffs' recovery based on Defendants' profits is equitable.

■ Lanham Act Defendants also argue that the award of all CDI profit, $1,070,581 in Count I and an award against Turney and CDI for $299,658 in Count II are duplicative. Count II was an action brought under Florida Statute § 495.151 (1989) for injury to Plaintiffs' business reputation caused by the unauthorized use of Alexander Scourby's name. The Defendant has not shown that these awards are duplicative to merit equitable adjustment to the jury verdict. Defendants could have requested that the Court instruct the jury to avoid awarding duplicative recovery, but they did not. *See Wynn Oil Co. v. Purolator Chemical Corp.*, 403 F.Supp. 226, 230–32 (M.D.Fla.1974).

■ Next Lanham Act Defendants argue that the recovery in Count I includes sales that occurred between January and May 1982, which should be excluded by the statute of limitations. CDI has failed to show that sales occurring between these months were actually considered by the Jury. CDI merely points to Plaintiffs' Exhibit 56, which lists the amount of sales per year but does not break down the months included in each year's sales. From this Exhibit the Court can not conclude that sales between January and May 1982 were considered by the jury and declines to reduce the jury award on this basis.

■ Lastly, the Lanham Act Defendants argue that the breach of contract damages against Episcopal Foundation make Plaintiffs whole and that any additional award is a windfall. This argument is without merit. In the breach of contract claim, the jury awarded Plaintiffs $172,000 against the Episcopal Foundation, which represents a reasonable royalty to which Plaintiffs would have been entitled if the Episcopal Foundation had properly negotiated a license to commercialize the narrations with Plaintiffs. In a Lanham Act claim, a prevailing plaintiff is entitled to a defendant's profits, the costs of the action, and any damages sustained by plaintiff. *Ramada Inns, Inc. v. Gadsden Motel Co.*, 804 F.2d 1562, 1564 (11th Cir.1986). A reasonable royalty is one method to value any damages sustained by a plaintiff in a Lanham Act claim. 2 J.T. McCarthy, Trademarks and Unfair Competition § 30.27(d), at 512–13 (2d ed. 1984). Thus under Plaintiffs' Lanham Act action Plaintiffs would have also been entitled to the same amount that they received in the breach of contract action against the Episcopal Foundation, which was not a Defendant in the Lanham Act claim; thus the award of damages in the contract action did not make Plaintiffs whole, and the Court declines to reduce the jury award on that basis.

CDI's Motion for Directed Verdict on Plaintiffs' Count IV (Copyright Ownership) and Counterclaim Count Ten (Quiet Title Action) (Doc. No. 277, filed October 31, 1989) and Plaintiffs' Memorandum of Law in Opposition to CDI's Motion for Directed Verdict on Plaintiffs' Count IV (Copyright ownership) and Counterclaim Count Ten (Quiet Title Action) (Doc. No. 284, filed November 30, 1989), is DENIED.

In conclusion, it is ORDERED AND ADJUDGED:

1. The Motion of Plaintiffs for Entry of Judgment (Docket No. 273) is GRANTED IN PART AND DENIED IN PART in that compensatory and punitive damages are granted, treble damages are denied, prejudgment interest is denied, and attorneys fees and costs as to the Lanham Act claim are granted. As to the declaratory judgment, the Court finds that the Estate of Alexander Scourby is the owner of the copyright in the sound recordings, that the Episcopal Foundation is the holder of a license as described in this Order, and that Plaintiffs are entitled to a permanent injunction and cancellation of CDI's trademark. The application for destruction of the infringing articles is denied.

2. The Renewed Motion of Episcopal Foundation for Directed Verdict (Docket No. 274) is DENIED.

3. The Renewed Motion of CDI, CD, Turney, and ICC (Docket No. 276) is DENIED.

4. The Motion of CDI for Directed Verdict (Docket No. 277) is DENIED.

5. The Motions of Plaintiffs and Counterdefendants for Extensions of Time (Docket Nos. 279 & 280) are GRANTED.

6. The Motion of Episcopal Foundation for Oral Argument (Docket No. 286) is DENIED.

7. The Motion of CDI for Oral Argument (Docket No. 288) is DENIED.

8. The Motion of Plaintiffs for Expedited Consideration (Docket No. 291) is GRANTED.

9. The Stipulation for Substitution of Counsel (Doc. No. 297) is GRANTED.

10. The Second Motion of Plaintiffs for Expedited Consideration (Docket No. 298) is GRANTED.

11. The Motion of Plaintiffs to Strike (Doc. No. 299) is DENIED.

DONE AND ORDERED.